# In the United States Bankruptcy Court
## for the
### Southern District of Georgia
#### Savannah Division

**FILED**

**Samuel L. Kay, Clerk**
**United States Bankruptcy Court**
**Savannah, Georgia**
*By camerson at 1:37 pm, Jul 01, 2011*

|  |  |  |
|---|---|---|
| In the matter of: | ) | |
| | ) | Chapter 7 Case |
| WARREN RANDALL SUMNER | ) | |
| JAMIE USHER SUMNER | ) | Number 10-41516 |
| | ) | |
| *Debtors* | ) | |

### MEMORANDUM AND ORDER
### ON MOTION OF THE UNITED STATES TRUSTEE
### TO DISMISS PURSUANT TO 11 U.S.C. § 707(b)

Debtors' Chapter 7 case was filed on July 21, 2010, and on October 19, 2010, the United States Trustee ("UST") filed a Motion to Dismiss the case under 11 U.S.C. § 707(b). Motion, Dckt. No. 34. Debtors opposed the Motion to Dismiss and the matter was continued to permit discovery. The parties ultimately entered into a stipulation of undisputed facts. Amended Undisputed Facts, Dckt. No. 57 (Mar. 2, 2011). The parties informed the Court that the stipulation and its related exhibits constituted the entirety of the record for the purpose of resolution of the Motion. They submitted briefs, and a review of those briefs, the undisputed facts, relevant documents, and applicable authorities leads me to conclude that the Motion should be granted.

AO 72A
(Rev. 8/82)

## FINDINGS OF FACT

The parties undisputed facts are repeated here *verbatim*:

The parties agree that the following facts are not in dispute:

1. The debtors, Mr. and Mrs. Sumner, filed a voluntary, joint petition under chapter 7 of the Bankruptcy Code on July 21, 2010.

2. The debtors are a married couple with two children, resulting in a household of four persons. Mr. Sumner is 38 years old and in good health. Mrs. Sumner is 36 years old and in good health. The debtors' children are 8 years old and 4 years old, respectively. The children are also in good health.

3. Mr. Sumner is a physician's assistant working at Memorial Hospital. His gross salary is $114,999.00 per year, which translates to $9,583.25 per month.

4. Mrs. Sumner is a self-employed real estate agent working out of her home and out of an office with Cora Bett Thomas in downtown Savannah. She specializes in marketing high end homes in the Dutch Island and Isle of Hope areas of Savannah. Her total selfemployment income from 2010 divided by 12 yields average income of $2,755.79 per month. This is 1099 income which means that she has to pay self-employment taxes which is the employer and the employee portion of social security and medicare in addition to the Federal and State Income tax. Mrs. Sumner's last real estate closing occurred on October 1, 2010. Her total self-employment expenses from 2010 divided by 12 yields average expenses of $737.73 per month.

5. On the petition date, the median income for a four-person family in the state of Georgia was $68,258.00.

6. Both of the debtors' children attend private school at Hancock Day School.

7. On the petition date, the debtors' unsecured, non-priority debts totaled $96,478.40.

8. The parties have included as Exhibit E on the parties' joint list of exhibits a revised Schedule I and J that accurately reflect the debtors' monthly income and expenses going forward.

### The Sumners' Pre-Petition Financial Difficulties

9. In 2005, the debtors purchased a home at 24 Liberty Creek Drive,

AO 72A
(Rev. 8/82)

Savannah, in the Dutch Island community. The purchase price of the home was $800,000.00. At the same time, the Debtors had an appraisal of the property which showed that the property had a value of $950,000. The purchase price and closing costs ($866,052.26) were financed by a $635,000.00 first mortgage from the seller, a $216,052.26 second mortgage from Sea Island Bank, and the debtors' $15,000.00 cash deposit.

10. The debtors subsequently obtained a third mortgage against their home at 24 Liberty Creek Drive from Regions Bank. The proceeds of the Regions Bank loan were used to make improvements to the property. On the petition date, the debtors owed $349,600.00 to Regions Bank.

11. The debtors also used their credit cards to fund improvements to their home at 24 Liberty Creek Drive. On the petition date, the majority of the debtors' credit card debt stemmed from these improvements. The rest of the credit card charges were used to satisfy the debtors' monthly living expenses.

12. Meanwhile, the real estate market took a downturn, negatively impacting Mrs. Sumner's income as a real estate agent for high end homes. The debtors began to struggle to service their various mortgage and credit card obligations.

13. In December 2006, Mr. Sumner borrowed $29,580.00 from his 401k account at Memorial. The funds were used to help the debtors stay current on their debts. The terms of the loan required bi-weekly payments of $284.43 for five years. The loan will be fully repaid by the end of 2011. The Debtors used the proceeds of the 401k loan to pay their mortgage and credit card obligations and to pay for their living expenses.

14. On January 11, 2008, the debtors withdrew $6,700 from one of the educational savings accounts they had previously set aside for their daughter. On March 5, 2010, the debtors withdrew $14,500 from another educational savings account they had previously set aside for their daughter. The debtors used the funds withdrawn from these educational savings accounts to pay their mortgage and credit card obligations and to pay for their living expenses.

15. On April 23, 2008, the debtors withdrew the funds remaining in a SEP IRA account and closed that account. The transaction resulted in a distribution of $20,168.40 to the debtors. On April 29, 2008, the debtors closed three other IRA accounts with balances of $3,209.80, $23,565.24, and $6,007.65, respectively, resulting in disbursements to the debtors in those amounts. The debtors used the funds disbursed to them from their IRA accounts to pay their mortgage and credit card obligations and to pay for their living expenses.

16. On March 13, 2008, the debtors purchased an unimproved residential lot located at 143 Terrapin Trail on Dutch Island for $229,000.00. Wells Fargo financed

$160,000.00 of the purchase price. $70,000 from the Regions third mortgage on the Debtor's residence at 24 Liberty Creek Drive was used to finance the remainder of the purchase price.

17. In April, 2007, the debtors listed their home at 24 Liberty Creek Drive for sale and continued to list the property up through the filing of their Chapter 7 bankruptcy filing. The price was reduced on several occasions, however, their efforts to sell the home ultimately proved unsuccessful and the property was foreclosed by the first mortgage holder after the bankruptcy case was filed.

18. During the months leading up to their bankruptcy filing, the debtors continued to supplement their income by using credit cards to satisfy their monthly living expenses. On January 1, 2010, the debtors opened up a new Chase Bank credit card account with a maximum credit limit of $10,000.00. The last four digits of that account number are 9997. From January 24, 2010 through May 11, 2010, the debtors incurred $11,722.17 in charges on that account and made the following three payments: $1,000.00 on March 2, 2010; $50.00 on March 23, 2010; and $77.00 on April 27, 2010. During that period of time, store credits totaling $591.43 were also applied against the outstanding balance. During June 2010 and the portion of July 2010 preceding the petition date, the only activity was the imposition of late fees and finance charges totaling $302.27. The payments and store credits noted above reduced the outstanding balance on Chase account no. 9997 to 10,306.01 as of the petition date.

19. On April 7, 2010, the debtors leased a new 2010 Mazda CX-9 five-door SUV which had a retail value of $33,000.00. The debtors traded in their 2006 Mercedes E350 (with a tradein value of $18,662.27) and received a credit of $5,275.67 (the equity in the Mercedes) toward the downpayment under the lease. The debtors paid $3,000.00 cash to cover the remainder of the downpayment. The lease required 36 monthly payments of $341.26 beginning April 7, 2010. The total of all the lease payments under the contract is $12,285.36. The payment on the 2006 Mercedes E350 was approximately $450.00 per month.

20. In the first part of 2010, the debtors purchased a set of bedroom furniture for their son from Rooms To Go using their credit card from GE Money Bank. The purchase price was $2,879.92. The monthly payment on this obligation is $137.10. According to the credit card agreement, the debtors agreed to grant GE Money Bank a purchase money security interest in the items purchased. The debtors' amended statement of intention indicates that they intend to reaffirm this debt. However, they have not filed a reaffirmation agreement with respect to this debt; nor have they made any payments on this debt after the petition date.

### Post-Petition Events

21. Along with their bankruptcy petition, the debtors filed a statement of

intent indicating that they would surrender their home at 24 Liberty Creek Drive. However, they intended to keep the unimproved lot at 143 Terrapin Trail. The Debtors later amended their statement of intent to surrender the lot.

22. The monthly payment on the unimproved lot was $1,200.00.

23. On the debtors' original Schedule J, they estimated their monthly housing costs going forward at $2,000.00 per month.

24. Prior to the meeting of creditors, the UST's office contacted debtor's counsel and suggested that the debtors could fund payments to unsecured creditors using the $1,200.00 per month that the debtors were, at that time, allocating for the mortgage payment on the unimproved lot, an asset that was not necessary to the debtors' health and welfare or for the production of income.

25. The meeting of creditors in the debtors' case was conducted on August 20, 2010.

26. On August 28, 2010, the debtors signed a lease to rent a home at 104 Hedge Nettle Crossing in the Dutch Island community of Savannah. The lease has a one-year term and requires monthly rent payments of $3,000.00.

27. The home at 104 Hedge Nettle Crossing has 3 bedrooms, 4 ½ bathrooms, a partial lagoon view, and a total area of 3800 square feet. Color photographs showing the exterior and interior of the home are posted at the following website and are incorporated herein by reference. The pictures of the inside of the house are not the Debtors' furnishings but are the owners furnishings before they were removed. http://www.perfectexposureimaging.com/reas/104_Hedge_Nettle_Cross/show.html.

28. In early 2010, Mrs. Sumner was hired by the owner to market the home at 104 Hedge Nettle Crossing. For most of 2009, the home had been marketed unsuccessfully by another agent with an asking price between $799,000.00 and $750,000.00. Mrs. Sumner originally listed the home at 104 Hedge Nettle Crossing for sale with an asking price of $750,000.00. After marketing the home unsuccessfully for several months, the asking price was reduced to $700,000.00, and there have been no offers to purchase the home at that price.

29. On September 8, 2010, the debtors filed amended Schedules I and J and an amended statement of intent. The amended statement of intent reported that the debtors had decided to surrender the unimproved lot at 143 Terrapin Trail in addition to their home at 24 Liberty Creek Drive.

30. Notwithstanding the surrender of the unimproved lot and removal of the

mortgage expense associated with it from Schedule J, the amended Schedules I and J showed that the debtors' disposable income was worse than originally reported, dropping from −$628.90 per month to −$1,702.06 per month.

31. On October 14, 2010, the debtors and Chase Bank filed a stipulation and joint motion for an order extending the time for Chase Bank to file a nondischargeability complaint pursuant to § 523 of the Bankruptcy Code with respect to the credit card account number ending in 9997. The debtors agreed to reaffirm a portion of the debt owed to Chase Bank. The extension of the § 523 deadline was intended to give Chase Bank an opportunity to file a § 523 complaint if the debtors withdrew their proposed reaffirmation agreement during the 60-day rescission period. Warren Sumner stipulated that between January 2010 and May 2010, he incurred an outstanding balance of $10,306.01 on his Visa card with Chase Bank.

32. On October 19, 2010, the UST filed a motion to dismiss this case for abuse pursuant to 11 U.S.C. § 707(b). The initial hearing on this motion was scheduled for December 14, 2010.

33. On November 3, 2010, Chase Bank filed a reaffirmation agreement with the Court wherein Mr. Sumner reaffirmed a portion of the credit card debt owed to Chase Bank. The reaffirmation agreement indicates that the debtors have no disposable income with which to make the required $100.00 monthly payment to Chase Bank. The agreement states that "debtors will attempt to reduce expenses or borrow money from family to pay this debt."

34. On December 13, 2010, the debtors filed a response to the UST's motion to dismiss. Attached as Exhibit B to their response was a new Schedule J, constituting the debtors' third such schedule in this case. The new Schedule J reported disposable income of −$1,628.42 per month.

35. To fund the deficit in their monthly budget, the debtors have borrowed $6,000.00 from Mrs. Sumner's parents since the petition date. Until their income increases or they reduce their monthly expenses, the debtors plan to continue borrowing from family to cover their monthly expenses. Other than these loans from family, the debtors' only source of funds is the income they earn from their employment as a physician's assistant and a real estate agent, respectively.

## CONCLUSIONS OF LAW

Section 707(b) of the Bankruptcy Code authorizes the UST to prosecute a

Motion to Dismiss if the UST believes the filing of a Chapter 7 case constitutes an abuse of

the Bankruptcy Code. Section 707(b)(2) provides a "means test," the failure of which creates a presumption of abuse. Debtors did not "fail" the means test, and therefore that presumption did not arise in this matter. In cases where the presumption of abuse does not arise, the Court may still find that the granting of Chapter 7 relief would be an abuse pursuant to § 707(b)(3), which directs the Court to consider whether the debtor filed the petition in bad faith or whether the totality of circumstances of Debtors' financial situation demonstrates abuse.

## I.  The Totality of the Circumstances Demonstrates Abuse

This "totality" proceeding under § 707(b)(3)—involving debtors with high incomes—traverses a landscape which this Court has visited on a number of occasions. In one recent case I found that the debtor was abusing the Bankruptcy Code and I granted the UST's motion. In re Truax, 446 B.R. 638 (Bankr. S.D. Ga. 2010) (Davis, J.). In another recent case I concluded that the debtor's actions did not constitute abuse. In re McKay, 2010 WL 6519012 (Bankr. S.D. Ga. 2010) (Davis, J.).

Each of those cases dealt with contentions—made by the UST—that the debtors' lavish lifestyle, when coupled with their ability to repay, demonstrated abuse of the Bankruptcy Code. I have previously held that ability to repay, standing alone, does not support a finding of abuse. *See e.g.,* McKay, 2010 WL 6519012 at *5. However, the ability to repay a meaningful portion of the debt is both the starting point and the most important factor in the "totality" analysis. Id.; Truax, 446 B.R. at 642. Because "the most important factor [in determining abuse under § 707(b)] is whether a debtor has the ability to repay a

meaningful portion of his debts from future income in a Chapter 13 plan," I begin my analysis there. McKay, 2010 WL 6519012 at *5.

### a. Debtors Have the Ability to Repay a Meaningful Portion of Their Debts From Their Future Income

The parties stipulated to Exhibit E—Amended Schedule I (Current Income of Debtors) and Amended Schedule J (Current Expenditures of Debtors)—for purposes of this Motion to Dismiss. Those Amended Schedules show that Debtors have a monthly net income of −662.87.[1] Amended Schedule J, Exhibit E. However, this Court finds that Debtors' monthly net income should be adjusted as follows.

Despite the fact that Debtors had estimated their future monthly housing costs at $2,000.00 per month (Stipulation 23), they entered into a one-year rental contract which required monthly payments of $3,000.00, and which expires on August 27, 2011. Stipulation 26. The UST attacks that expenditure as excessive and indicative of abuse. Still, this Court has previously ruled—and reiterates now—that it will not accept the UST's (or anyone else's) contention that a debtor's refusal to relocate to lower-cost housing is always an indicium of abuse. This Court is not bound to the IRS standard allowances for housing, which is binding only in the context of § 707(b)(2). However, since it was the Debtors who believed that suitable housing could be obtained for $2,000.00—$1,000.00 less per month

---

[1]Debtors' stipulation to this number as a forward-looking estimate is discussed in more detail in this Court's July 1, 2011, Order on Trustee's Motion to Amend Judgment. In re Sumner, Case No. 10-41516 (July 1, 2011) (Davis, J.).

than they are currently paying—once that lease ends, Debtors will arguably have $1,000.00 more in monthly disposable income than they show on their schedules. According to the stipulations, this extra disposable income will be available no later than September of 2011. Stipulation 26. Additionally, Debtors took out a loan against Mr. Sumner's 401(k). That loan requires bi-weekly payments of $284.43, but will be fully repaid by the end of 2011. Stipulation 13. This monthly loan repayment amount of $616.27 will be available to Debtors for debt service in approximately six months.

Attributing to Debtors the rent difference of $1,000.00 and the 401(k) repayment difference of $616.27, those changes would increase Debtors' monthly income by +$1,616.27. Because the parties stipulated that Debtors (for purposes of this Motion) have a disposable income of -662.87, this increase would leave Debtors with a positive disposable income of $953.40 per month. Over five years, this would generate approximately $57,204.00,[2] or a dividend to unsecured creditors of approximately 56.52%

---

[2]This Court calculated the five year repayment at $953.40 per month over sixty months. I acknowledge that neither the 401(k) repayment nor the rent differential will be available for the entire sixty month period. The actual number is likely closer to $51,506.38, calculated as follows:

| Months | Number of Months | Disposable Income per Month | Total Disposable Income |
|---|---|---|---|
| July 2011-August 2011 | 2 | -$662.87 (stipulated) | -$1,325.74 |
| September 2011-December 2011 | 4 | $337.13 (stipulated + $1,000.00 for rent differential) | $1,348.52 |
| January 2012- June 2016 | 54 | $953.40 (stipulated + $1,000.00 for rent differential + $616.27 for 401(k) repayment) | $51,483.60 |
| **TOTAL** | **60** | | **$51,506.38** |

However, neither the actual repayment number nor the actual dividend percentage requires precision. I find that, given the adjustments mentioned above, Debtors could repay a meaningful portion of their unsecured debt from future income.

AO 72A
(Rev. 8/82)

(on unsecured debt of $101,212.58).  *See* Original Schedules E and F, refiled as Exhibit A to the Amended Stipulations.  Accordingly, I find that Debtors could repay a meaningful portion of their debt from their future income.

### b.  Debtors' Expenditures Indicate Abuse

There are numerous expenditures which suggest that Debtors' case might fit the "lavish lifestyle" line of cases.  From the time Debtors took their third mortgage on their house (Stipulation 10), they were living beyond their means.  For example, Debtors were using credit cards to satisfy their living expenses (Stipulation 11), were forced to take a 401(k) loan (Stipulation 13), withdrew money from an educational account which they had created for their daughter (Stipulation 14), withdrew money from a retirement IRA (Stipulation 15), and listed their home for sale in April of 2007 (Stipulation 17).  Debtors also obtained a new credit card in January of 2010 and incurred more than $10,000.00 in unsecured debt during a four-month period ending shortly before they filed Chapter 7.  Stipulation 18.  Using a credit card, Debtors purchased new bedroom furniture (at a price of almost $3,000.00) for their son just months before they filed Chapter 7.  Stipulation 20.  Finally, financial difficulties forced them out of their home on Liberty Creek Drive.  Stipulation 17.

Nevertheless, in March 2008—approximately a year and a half after they started borrowing from their 401(k)—Debtors incurred an additional $160,000.00 debt to purchase an unimproved lot.  Stipulation 16.

These facts weigh in favor of finding abuse. The facts in the case *sub judice* are more analogous to the facts in Truax than to those in McKay. Therefore, based on this Court's precedent, I find that the totality of the circumstances of Debtors' financial situation demonstrates abuse of the Bankruptcy Code and the case will be dismissed pursuant to 11 U.S.C. § 707(b)(3)(B).

## II. This Court Need Not Consider UST's Bad Faith Assertion

Because this Court has found that the totality of the circumstances of Debtors' financial situation demonstrates abuse, it need not consider the assertion that Debtors filed the petition in bad faith pursuant to 11 U.S.C. § 707(b)(3)(A).

## ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the United States Trustee's Motion to Dismiss is GRANTED.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia
This _____ day of July, 2011.